MARGARET A. MOESER (Cal. Bar No. 253177)
Chief, Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice
STEPHANIE WILLIAMSON
Trial Attorney, Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice
CHELSEA R. ROONEY
Trial Attorney, Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice
      1400 New York Ave NW
      Washington, DC 20005-2107
      Telephone: (202) 514-1263
      Facsimile: (202) 428-6957
      E-mail:   Margaret.Moeser@usdoj.gov
                Chelsea.Rooney@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                  UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

                         EASTERN DIVISION

| UNITED STATES OF AMERICA, | No. 5:25-CV-347 |
|---|---|
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE |
| v. | 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6) |
| REAL PROPERTY LOCATED IN RIVERSIDE, CALIFORNIA, | [DEA] |
| Defendant. | |

        Plaintiff United States of America brings this action against

defendant real property located at 1191 Pamplona Drive, Riverside,

California, 92508 ("Defendant Real Property"), and consistent with

Supplemental Rule G of the Federal Rules of Civil Procedure, alleges

as follows:

NATURE OF THE ACTION

1.    This is a civil action to forfeit property to the United States of America for violations of 21 U.S.C. §§ 959(a), 960(b)(1)(B) and (b)(1)(H), 963, and 18 U.S.C. §§ 1956(a) and (h), and 1957.

JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this action commenced by the United States under 28 U.S.C. § 1345.

3.    This Court also has jurisdiction over this civil forfeiture action under 28 U.S.C. § 1355(a).

4.    This Court has *in rem* jurisdiction over the Defendant Real Property under 28 U.S.C. § 1355(b).

5.    Venue is proper in this District under 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in this District.

6.    Venue also lies in this District under 28 U.S.C. § 1395(b) as Defendant Real Property is physically located in this District.

PERSONS AND ENTITIES

7.    The Plaintiff in this action is the United States of America.

8.    The Defendant Real Property has Assessor's Parcel Number of 276-360-049, TRA:009-144 and the following legal description:

        The land referred to herein below is situated in the city
        of Riverside, County of Riverside, State of California and
        is described as follows:

        Parcel A:

1          Lot 98 of Tract No. 29242, in the City of Riverside, County

2          of Riverside, State of California, on file in Book 307,

3          pages 86 through 97 inclusive of maps, records of said

4          County, and amended by certificate of correction recorded

5          January 30, 2002, as Instrument No. 2002-53378, official

6          records of Riverside County.

7          Parcel B:

8          A non-exclusive appurtenant easement for ingress and egress

9          over the "streets" within Tract No. 29242, as shown on map

10         on file in Book 307, page 86 through 97, inclusive of maps,

11         in the County Recorder of Riverside County pursuant and

12         subject to the terms and provisions of that certain

13         declaration, grant and reservation of easement rights

14         recorded March 8, 2002, as Instrument No. 2002-120654 of

15         official records of Riverside County

16   (collectively the "Defendant Real Property").

17   <u>BASIS FOR FORFEITURE</u>

18       9.    The Defendant Real Property is subject to forfeiture to the

19   United States under 21 U.S.C. § 881(a)(6) because it constitutes or

20   is traceable to proceeds of transacted exchanges of controlled

21   substances in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B) and

22   (b)(1)(H), and 963.

23       10.   The Defendant Real Property is subject to forfeiture to the

24   United States under 18 U.S.C. § 981(a)(1)(A) because it was involved

25

1   in concealment money laundering transactions committed in violation

2   of 18 U.S.C. § 1956(a) and (h).

3       11.   The Defendant Real Property is also subject to forfeiture

4   to the United States under 18 U.S.C. § 981(a)(1)(A) because it was

5   the subject of, and was therefore involved in, spending money

6   laundering transactions committed in violation of 18 U.S.C. § 1957.

7                              FACTS

8   THE JALISCO NEW GENERATION CARTEL

9       12.   The Jalisco New Generation Cartel ("CJNG") is a

10  transnational criminal organization based in Jalisco, Mexico.

11      13.   Formed in approximately 2010, the CJNG has evolved into one

12  of the most prominent and powerful criminal organizations in Mexico.

13      14.   The CJNG is recognized as one of the most violent drug

14  cartels currently in operation.

15      15.   Since its inception, the CJNG has acquired, and now wields,

16  substantial influence over various drug trafficking routes into the

17  United States and the distribution of controlled substances within

18  parts of the United States and beyond.

19  THE CJNG'S TRAFFICKING IN CONTROLLED SUBSTANCES

20      16.   Since approximately 2012, the United States Drug

21  Enforcement Administration ("DEA") and other United States law

22  enforcement agencies have been investigating the CJNG's drug

23  trafficking and money laundering activities in the United States and

24  elsewhere.

25

                               4

17.  The CJNG traffics in dangerous controlled substances such as fentanyl, precursor chemicals, cocaine, and methamphetamine.

18.  The investigation has led to dozens of federal indictments against members and associates of the CJNG.

19.  The investigation has also led to the convictions in the District of Columbia of many individuals for their participation in CJNG drug trafficking and money laundering crimes. *See, e.g., United States v. Ruben Oseguera Gonzalez*, 1:16-CR-00229; *United States v. Gerardo Gonzalez Valencia and Jose Gonzalez Valencia*, 1:16-CR-00065; *United States v. Juan Manual Abouzaid El Bayeh*, 1:17-CR-00094; *United States v. Javier Algredo Vazquez*, 1:21-CR-00597.

CJNG LEADERSHIP

20.  The founder and undisputed leader of the CJNG is Nemesio Ruben OSEGUERA-CERVANTES, also known as "EL MENCHO."

21.  In 2014, EL MENCHO was indicted in the District of Columbia for his participation in a continuing criminal enterprise. 1:14-CR-00051.

22.  Currently, EL MENCHO remains a fugitive at-large in Mexico.

23.  Cristian Fernando GUTIERREZ-OCHOA ("GUTIERREZ-OCHOA") is married to or in a romantic relationship with EL MENCHO's daughter. EL MENCHO's daughter is a U.S. citizen.

24.  GUTIERREZ-OCHOA is a high-level drug trafficker and high-ranking leader for the overall CJNG criminal organization.

GUTIERREZ-OCHOA's TRAFFICKING OF INDUSTRIAL QUANTITIES OF DANGEROUS DRUGS INTO THE UNITED STATES

25.   As a part of his duties within the CJNG, GUTIERREZ-OCHOA was responsible for driving methamphetamine shipments within Mexico between clandestine laboratories where methamphetamine is produced to stash locations where methamphetamine is stored.

26.   On at least four occasions between approximately 2014 to 2015, GUTIERREZ-OCHOA transported within Mexico industrial quantities of methamphetamine and cocaine destined for the United States.

27.   Within approximately that period, GUTIERREZ-OCHOA trafficked approximately 40,000 kilograms of methamphetamine destined for the United States.

28.   In March 2015, GUTIERREZ-OCHOA participated in a CJNG meeting in which EL MENCHO arranged security for GUTIERREZ-OCHOA's transportation of cocaine through a certain region of Mexico.

29.   GUTIERREZ-OCHOA then coordinated the shipment of industrial quantities of cocaine, which was destined for the United States, through that region within Mexico.

30.   The security EL MENCHO arranged escorted GUTIERREZ-OCHOA and his multi-ton cocaine shipment through the territory.

31.   GUTIERREZ-OCHOA used two cargo vans that held two metric tons of cocaine to make that shipment.

32.   Thus, GUTIERREZ-OCHOA has participated in the transportation of industrial quantities of methamphetamine and

6

cocaine within Mexico in furtherance of a conspiracy to import those drugs into the United States.

GUTIERREZ-OCHOA's LEADERSHIP-LEVEL RESPONSIBILITY WITHIN THE CJNG AND CLOSE WORKING RELATIONSHIP WITH EL MENCHO

33.   GUTIERREZ-OCHOA occupies a high-level leadership position within the CJNG criminal organization and has a close working relationship with EL MENCHO.

34.   In 2014, Abigael GONZOLEZ-VALENCIA ("GONZOLEZ-VALENCIA") was indicted with EL MENCHO in a case in the District of Columbia.

35.   At all material times, GONZOLEZ-VALENCIA was EL MENCHO's brother-in-law and occupied a leadership position within the CJNG.

36.   On June 21, 2013, GONZOLEZ-VALENCIA discussed a drug debt issue that he blamed, in part, on GUTIERREZ-OCHOA. Upset with the expediency at which GUTIERREZ-OCHOA had made a delivery of narcotics, GONZOLEZ-VALENCIA indicated that GUTIERREZ-OCHOA did ultimately deliver the drugs associated with this drug debt.

37.   GONZOLEZ-VALENCIA referred to GUTIERREZ-OCHOA by one of his cartel monikers: "Palomo."

38.   Drug traffickers commonly use monikers, as opposed to their real names, to evade detection by law enforcement, rival cartel members, or both.

39.   On July 11, 2013, GONZOLEZ-VALENCIA discussed the manufacture and trafficking of methamphetamine into the United States.

40.   On both June 21, 2013, and July 11, 2013, GONZOLEZ-VALENCIA indicated that GUTIERREZ-OCHOA, referred to as "Palomo," preferred to traffic in methamphetamine or in a specific type of methamphetamine.

41.   On November 2, 2013, EL MENCHO indicated that EL MENCHO had delegated an important decision about the division and control of CJNG cartel territory directly to GUTIERREZ-OCHOA.

42.   EL MENCHO also referred to GUTIERREZ-OCHOA as his "friend," which carries immense significance based on EL MENCHO's role as the undisputed leader and original founder of the CJNG.

THE CONTRIVED DISAPPEARANCE OF GUTIERREZ-OCHOA TO EVADE JUSTICE AND HIS ADOPTION OF A FAKE IDENTITY

43.   In 2024, the DEA was made aware that GUTIERREZ-OCHOA had gone missing in Mexico on or about December 2023.

44.   At that time, it was generally believed that EL MENCHO had murdered GUTIERREZ-OCHOA for lying to EL MENCHO.

45.   In October 2024, DEA-Los Angeles was informed by the Department of Homeland Security ("DHS") that GUTIERREZ-OCHOA was wanted by the government of Mexico ("GOM"), with the United States as a likely travel destination.

46.   In the course of its investigation, DEA learned that the GOM had accused GUTIERREZ-OCHOA of organized crime activities, detaining hostages, and kidnapping.

47.   Specifically, DEA learned that the GOM had accused GUTIERREZ-OCHOA of kidnapping two service members of the Mexican Navy.

8

48.   GUTIERREZ-OCHOA allegedly held these Mexican service members hostage in an attempt to negotiate the release of EL MENCHO's wife—and who is also GUTIERREZ-OCHOA's mother-in-law—who had been arrested and was then being detained by GOM law enforcement authorities.

49.   In October 2024, by comparing known photographs of GUTIERREZ-OCHOA, DHS found a close match to the likeness of a man residing in California named "Miguel Luis MARTINEZ."

50.   Through facial recognition software, credit report records, and a variety of law enforcement database information marshaling, the Government determined GUTIERREZ-OCHOA and MARTINEZ are, in fact, the same person.

51.   GUTIERREZ-OCHOA had assumed a false identity under the name Miguel Luis MARTINEZ.

52.   Upon information and belief, GUTIERREZ-OCHOA faked his own death in Mexico to evade GOM authorities and to escape into and unlawfully enter the United States.

THE ARREST OF GUTIERREZ-OCHOA AT THE DEFENDANT REAL PROPERTY AND HIS ACKNOWLEDGMENT OF HIS TRUE IDENTITY

53.   On November 6, 2024, the Government obtained a criminal complaint and arrest warrant from the District Court for the District of Columbia charging GUTIERREZ-OCHOA with an ongoing conspiracy to import cocaine and methamphetamine into the United States as well as related money laundering violations.

54.   On November 19, 2024, federal law enforcement agents

executed a search, pursuant to a federal search warrant, at the Defendant Real Property.

55.   The Defendant Real Property is GUTIERREZ-OCHOA's residence.

56.   On November 19, 2024, GUTIERREZ-OCHOA was found at the Defendant Real Property and was arrested.

57.   On November 19, 2024, at the time of GUTIERREZ-OCHOA's arrest, GUTIERREZ-OCHOA's wife or girlfriend, who is also EL MENCHO's daughter, was present at Defendant Real Property.

58.   Upon apprehension, GUTIERREZ-OCHOA acknowledged his true identity to arresting Government agents.

59.   On November 20, 2024, GUTIERREZ-OCHOA made his first appearance in the District Court for the Central District of California.

60.   When addressed by the Court as "Cristian Fernando GUTIERREZ-OCHOA," GUTIERREZ-OCHOA again responded in the affirmative.

61.   According to California state records, a California driver's license existed under the name "Miguel Luis MARTINEZ"–the false identity GUTIERREZ-OCHOA used. The mailing address listed for the license is that of the Defendant Real Property.

62.   On or about July 21, 2024, GUTIERREZ-OCHOA applied for a vehicle lease using his false identity, "Miguel Luis MARTINEZ." On the lease application, GUTIERREZ-OCHOA, using his Miguel Luis MARTINEZ alias, again listed Defendant Real Property as his mailing address.

63.   The facts that GUTIERREZ-OCHOA, using the alias Miguel Luis

Martinez, listed the Defendant Real Property as his residence on both his driver's license and vehicle lease application confirm that he does in fact live at and/or own the Defendant Real Property despite his denials, upon arrest, of permanently residing at or owning the Defendant Real Property.

GUTIERREZ-OCHOA'S UNEXPLAINED WEALTH AND OPULENCE

64.  Upon GUTIERREZ-OCHOA's arrest at the Defendant Real Property, Government agents observed and then seized approximately $2.25 million in United States currency located in Defendant Real Property.

65.  Some of the seized currency was wrapped tightly in rubber-banded bundles, a hallmark of cash drug proceeds.

66.  Upon GUTIERREZ-OCHOA's arrest at the Defendant Real Property, Government agents also observed at Defendant Real Property and then seized, in addition to the approximately $2.25 million in United States currency, many luxury items that themselves have an estimated retail value of somewhere between $7 and $13 million.

67.  Those luxury items include original artwork, high-end wrist watches, designer shoes, luxury purses, handbags and bedding, jewelry, and vehicles.

68.  Upon GUTIERREZ-OCHOA's arrest at the Defendant Real Property, Government agents also observed and then seized two firearms. One firearm had an obliterated and defaced serial number, metal plated grips, bullets and loaded magazines. The other firearm

was a loaded "ghost gun" – a privately assembled and untraceable firearm.

69.  On November 26, 2024, the Honorable Alicia G. Rosenberg, United States Magistrate Judge for the Central District of California, ordered pretrial detention for GUTIERREZ-OCHOA upon the Government's motion.

70.  In support of the Order of Detention, Magistrate Judge Rosenberg found that GUTIERREZ-OCHOA lacked any legal status in the United States.

71.  Magistrate Judge Rosenberg likewise found that GUTIERREZ-OCHOA had "strong cartel and family ties abroad."

72.  Magistrate Judge Rosenberg also noted the "large amounts of cash found in [the Defendant Real Property] during arrest," GUTIERREZ-OCHOA's "multiple identities," and the seizure of "two (ghost) guns" at the Defendant Real Property (*See* ¶ 68 for clarification that in fact there was only one ghost gun and one gun with an obliterated serial number).

73.  To date, the Government has not found any evidence indicating that GUTIERREZ-OCHOA has held a legitimate job or earned any legitimate income in recent years.

74.  In the above-mentioned July 21, 2024, vehicle leasing application (*see* ¶ 62), GUTIERREZ-OCHOA, under the "Miguel Luis MARTINEZ" false identity, stated that he made a monthly income of $9,000 through a landscaping business, "MARTINEZ LANDSCAPE."

75.  No paper records recovered during the search of the

Defendant Real Property indicate that GUTIERREZ-OCHOA actually operated or received any income from any landscaping business.

76.   In any event, even if GUTIERREZ-OCHOA did operate a landscaping business from which he earned $9,000 per month—or $108,000 per year—such an amount of presumably legitimate income would still be nowhere near enough to explain GUTIERREZ-OCHOA's accumulation of the approximately $2.25 million in currency and the vast amount of valuable luxury items that were seized at the Defendant Real Property and appear to belong to GUTIERREZ-OCHOA.

THE PURCHASE OF THE DEFENDANT REAL PROPERTY WITH LAUNDERED DRUG PROCEEDS IN THE NAME OF AN ENTITY, PASION AZUL

77.   The Defendant Real Property was purchased by an entity named "Pasion Azul, S.A. de C.V." ("PASION AZUL"), which is registered in the country of Mexico, for the sum of approximately $1.2 million.

78.   The purchase was purportedly made through PASION AZUL's "Manager," Javier Sanchez Aguirre.

79.   The purchase price was paid through two wire transfers:

   a. A November 9, 2023, wire transfer in the amount of $35,390.00 from the Bank of New York Mellon ("BK OF NYC") on behalf of "Pasion Azul SA de CV", with sender address: "Emiliano Zapata, Mexico[;]" and

   b. A November 27, 2023, wire transfer in the amount of $1,168,740.35 from the Bank of New York Mellon ("BK OF NYC") with a sender address: "Emiliano Zapata,

1          Mexico."

2          80.   This November 2023 purchase of the Defendant Real Property

3    coincided with GUTIERREZ-OCHOA's disappearance in Mexico and his

4    assuming the MARTINEZ false-identity in the United States.

5          81.   PASION AZUL purports to be an agricultural tequila

6    manufacturing entity in Jalisco, Mexico, the same region out of which

7    the CJNG is based and operates.

8          82.   As of January 16, 2025, title to Defendant Real Property

9    continues to be listed in the name PASION AZUL.

10         83.   In Riverside, California real estate transactions, it is

11   the almost uniform practice for the seller of real property to choose

12   the titling company that will service the transaction.

13         84.   But in the transaction of Defendant Real Property, PASION

14   AZUL's purchasing agent insisted that the transaction go through a

15   specific titling company selected by PASION AZUL.

16         85.   PASION AZUL's agent was adamant that a specific titling

17   officer from this particular title company service the transaction

18   involving Defendant Real Property.

19         86.   PASION AZUL's property purchasing agent used its title

20   company and handpicked titling officer to "pre-approve" the titling

21   of Defendant Real Property to PASION AZUL.

22         87.   This practice is highly unusual in Riverside, California

23   real estate transactions. In fact, the property seller's agent found

24   the practice suspicious.

25         88.   Upon information and belief, and based on the experience

                                  14

and industry knowledge of the property seller agent, the only conceivable reason for a purchaser of real property to select the titling company and to go through this unusual pre-approval process, would be to evade scrutiny of the bona fides of the purchaser of the Defendant Real Property.

89.    Government agents interviewed the escrow agent, real estate agent, and original seller of Defendant Real Property. Each independently noted the suspicious circumstances surrounding the purchase of Defendant Real Property.

90.    In particular, on or about October 15, 2024, the original seller—a then-financially distressed party—told Government agents that they believed the purported representatives of PASION AZUL were "drug dealers" from Mexico at the time of transaction.

91.    During November 2023, as confirmed by video surveillance footage, GUTIERREZ-OCHOA visited the Defendant Real Property on or about the date when purported PASION AZUL representatives were shown the property.

92.    GUTIERREZ-OCHOA again visited the Defendant Real Property on or about the date when it was sold to PASION AZUL, as also confirmed by video surveillance footage.

93.    Upon information and belief, the Defendant Real Property was purchased for the benefit of GUTIERREZ-OCHOA, EL MENCHO, and/or the CJNG, using proceeds of trafficking in controlled substances.

PASION AZUL IS A CJNG MONEY LAUNDERING FRONT

94.    The CJNG organization, EL MENCHO, GUTIERREZ-OCHOA, and/or

15

others acting on their behalf have used PASION AZUL as a nominee to
purchase the Defendant Real Property using funds consisting of
proceeds of specified unlawful activity, namely, violations of
21 U.S.C. §§ 959(a), 960(b)(1)(B) and (b)(1)(H), and 963, while
knowing that those funds consisted of proceeds of some form of
unlawful activity and while knowing that the transaction was designed
in whole or in part to conceal the nature, source, ownership,
location, and control of those proceeds of unlawful activity.

95.  EL MENCHO owns a variety of illegitimate "front" tequila
companies, including PASION AZUL.

96.  EL MENCHO uses these front companies to launder CJNG drug
proceeds in Mexico and abroad to appear as fully legitimate income-
producing entities. In an effort to avoid suspicion, EL MENCHO used a
variety of front companies to prevent too much property being
associated with a particular company.

97.  From 2010 to 2011, EL MENCHO directed associates of the
CJNG to scout out farmland used for tequila agricultural production
in Jalisco, Mexico.

98.  In 2013, after ultimately finding desirable farmland, EL
MENCHO and various CJNG associates met in Jalisco with local
representatives of Company 1 – an internationally recognized tequila
manufacturer. At that time, Company 1 was using this land for its own
legitimate tequila agricultural production.

99.  In this 2013 meeting, EL MENCHO informed Company 1's
representatives that they were using farmland within his territory

1  and would therefore have to pay EL MENCHO a monthly extortion fee of

2  50,000,000 Mexican Pesos to continue to use this farmland.

3       100. By 2014, EL MENCHO's extortion of Company 1 forced Company

4  1 to abandon its farmland. Subsequently, EL MENCHO took over the

5  farmland, or caused the CJNG to do so, and began creating new tequila

6  businesses on or associated with that land to launder CJNG drug

7  proceeds through those tequila businesses.

8       101. Upon information and belief, EL MENCHO pursued, and

9  ultimately acquired, farmland for the use of tequila companies he or

10  CJNG caused to be formed. EL MENCHO, the CJNG, and/or others acting

11  on their behalf then used the tequila businesses to launder CJNG drug

12  proceeds.

13       102. Based on searches of government databases, PASION AZUL was

14  registered and incorporated in Mexico one year later in 2015. PASION

15  AZUL's public website also states it was established in 2015.

16       103. Upon information and belief, PASION AZUL was one of these

17  new businesses created by EL MENCHO and the CJNG to launder CJNG drug

18  proceeds. Upon information and belief, though Pasion Azul may have

19  some tequila producing operations, EL MENCHO, GUTIERREZ-OCHOA, and

20  the CJNG use PASION AZUL to launder CJNG drug proceeds.

21       104. Based on GOM Public Registry of Commerce records, the sole

22  administrator listed for PASION AZUL possesses approximately 53 other

23  trademarks, almost all of which are associated with the tequila and

24  alcoholic beverage industry.

25       105. Upon information and belief, EL MENCHO, GUTIERREZ-OCHOA,

and CJNG obtained the PASION AZUL and other alcohol trademarks as a part of their efforts to create tequila manufacturing entities in Mexico and to obtain trademarks in those entities' names to launder CJNG drug proceeds through those entities.

106. Upon information and belief, EL MENCHO, the CJNG organization, and GUTIERREZ-OCHOA, caused the GOM to issue one or more trademarks in the name of PASION AZUL to further their efforts to make PASION AZUL appear to be a fully legitimate business that was purchasing the Defendant Real Property with lawfully earned funds when, in fact, PASION AZUL was a nominee that was buying the property on behalf of the CJNG, GUTIERREZ-OCHOA, and/or EL MENCHO, using drug proceeds.

107. Although PASION AZUL has been incorporated since 2015, upon information and belief, the GOM first issued trademarks for PASION AZUL during summer 2023.

108. Multiple and various email addresses were used in applications for various PASION AZUL and related trademarks, including public email addresses hosted by Hotmail.

109. That so many public email addresses not associated with a corporate entity having the name PASION AZUL were used in applications to the GOM to apply for the trademarks related to PASION AZUL and the other related brands, indicates that PASION AZUL was used for illegitimate purposes at the time it applied for the trademarks.

110. The trademark applications submitted to the GOM on behalf of PASION AZUL list legal representatives for PASION AZUL different from those listed on the offer to purchase the Defendant Real Property.

111. These trademark applications were submitted to the GOM on or about February 15, 2023, and were approved on June 6, 2023.

112. The past owner of the Defendant Real Property listed it for sale on or about August 17, 2023.

113. The closing for the purchase of the Defendant Real Property in the name of PASION AZUL occurred on or about November 29, 2023.

114. Thus, the applications for trademarks for PASION AZUL were approved only about two months before the past owner initially listed the Defendant Real Property for sale.

115. Upon information and belief, the CJNG, EL MENCHO, GUTIERREZ-OCHOA, and/or others acting on their behalf caused the GOM to issue trademarks eight years after PASION AZUL's incorporation to ensure that Pasion Azul would further appear as a fully legitimate business for the purpose of purchasing a property such as the Defendant Real Property.

116. Upon information and belief, an agricultural tequila company from remote Jalisco, Mexico would appear to have no business-related reason to purchase a luxury home in Riverside, California, which is located more than 100 miles from the Mexican border and approximately 65 miles from Los Angeles.

117. Upon information and belief, at the time that the Defendant Real Property was purchased in the name of PASION AZUL, PASION AZUL was a nominee used to purchase the Defendant Real Property.

118. The CJNG, EL MENCHO, GUTIERREZ-OCHOA, and/or others acting on their behalf caused the Defendant Real Property to be purchased in the name of PASION AZUL to conceal the nature of the funds used to purchase that property, namely, that the funds consisted of drug proceeds rather than fully legitimate corporate earnings of an entity named PASION AZUL.

119. The CJNG, EL MENCHO, GUTIERREZ-OCHOA, and/or others acting on their behalf caused the Defendant Real Property to be purchased in the name of PASION AZUL to conceal the source of the funds used to purchase that property, namely, that the source of the funds was the CJNG, EL MENCHO, and/or GUTIERREZ-OCHOA.

120. The CJNG, EL MENCHO, GUTIERREZ-OCHOA, and/or others acting on their behalf caused the Defendant Real Property to be purchased in the name of PASION AZUL to conceal the ownership of the funds used to purchase that property, namely, by making the Defendant Real Property appear to be an asset owned by PASION AZUL rather than an asset that is, in fact, owned by the CJNG, EL MENCHO, and/or GUTIERREZ-OCHOA.

121. The CJNG, EL MENCHO, GUTIERREZ-OCHOA, and/or others acting on their behalf caused the Defendant Real Property to be purchased in the name of PASION AZUL to conceal the location of the funds used to purchase that property, namely, by purchasing the Defendant Real Property in the name of PASION AZUL and thereby concealing the

1  location of an asset, in fact, owned by the CJNG organization, EL

2  MENCHO, and/or GUTIERREZ-OCHOA.

3      122.  The CJNG, EL MENCHO,  GUTIERREZ-OCHOA, and/or others

4  acting on their behalf caused the Defendant Real Property to be

5  purchased in the name of PASION AZUL to conceal who controls the

6  funds used to purchase that valuable real property by making the real

7  property appear to be an asset controlled by an entity named PASION

8  AZUL rather than an asset controlled by the CJNG, EL MENCHO, and/or

9  GUTIERREZ-OCHOA.

10                     FIRST CLAIM FOR RELIEF

11     123. Plaintiff incorporates the allegations of paragraphs 1-122

12  above as though fully set forth herein.

13     124. The Plaintiff United States alleges that the Defendant Real

14  Property constitutes or is derived from proceeds traceable to

15  violations of 21 U.S.C. §§ 959(a) (manufacture or distribution for

16  purpose of unlawful importation), 960(b)(1)(B) (importation of 5

17  kilograms), 960(b)(1)(H) (importation of 50 grams or more of

18  methamphetamine), and 963 (drug conspiracy).

19     125. The Defendant Real Property is therefore subject to

20  forfeiture under 21 U.S.C. § 881(a)(6) as traceable to drug proceeds.

21                     SECOND CLAIM FOR RELIEF

22     126. Plaintiff incorporates the allegations of paragraphs 1-122

23  above as though fully set forth herein.

24     127. The Plaintiff United States alleges that the Defendant Real

25  Property constitutes property involved in multiple financial

transactions or attempted financial transactions that affected interstate and foreign commerce-the November 9, 2023, and November 27, 2023, wire transfers through Bank of New York Mellon-and that were conducted in violation of 18 U.S.C. § 1956(a) and (h).

128. Those financial transactions involved proceeds of specified unlawful activity, namely, funds constituting proceeds of violations of 21 U.S.C. §§ 959(a) (manufacture or distribution for purpose of unlawful importation), 960(b)(1)(B) (importation of 5 kilograms), 960(b)(1)(H) (importation of 50 grams or more of methamphetamine), and 963 (drug conspiracy).

129. During the conduct of those financial transactions made preliminarily to and while purchasing the Defendant Real Property, EL MENCHO, the CJNG, GUTIERREZ-OCHOA, and/or others acting on their behalf knew that the funds involved in those transactions involved the proceeds of some form of unlawful activity.

130. During the conduct of those financial transactions, EL MENCHO, the CJNG, GUTIERREZ-OCHOA, and/or others acting on their behalf knew that those financial transaction were designed in whole or in part to conceal the nature, location, source, ownership, and control of those proceeds of unlawful activity.

131. The Defendant Real Property is therefore subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) as having been involved in concealment money laundering transactions conducted in violation of 18 U.S.C. § 1956(a) and (h).

1

## THIRD CLAIM FOR RELIEF

2    132. Plaintiff incorporates the allegations of paragraphs 1-122

3 above as though fully set forth herein.

4    133. The Plaintiff United States alleges that the Defendant Real

5 Property was the subject of, and likewise involved in, unlawful

6 monetary transactions that were conducted preliminarily to and in the

7 course of purchasing the Defendant Real Property and which monetary

8 transactions were committed in violation of 18 U.S.C. § 1957.

9    134. Those monetary transactions were conducted by, through, or

10 to a financial institution, as defined in 18 U.S.C. § 1956(c)(6), and

11 affected interstate and foreign commerce.

12    135. While conducting those monetary transactions preliminarily

13 to and in the course of purchasing the Defendant Real Property, EL

14 MENCHO, the CJNG, GUTIERREZ-OCHOA, and/or others acting on their

15 behalf knew that at least some of the funds involved in those

16 monetary transactions constituted criminally derived property of some

17 kind.

18    136. Those monetary transactions in fact involved proceeds of

19 specified unlawful activity, namely, funds constituting proceeds of

20 violations of 21 U.S.C. §§ 959(a) (manufacture or distribution for

21 purpose of unlawful importation), 960(b)(1)(B) (importation of 5

22 kilograms), 960(b)(1)(H) (importation of 50 grams or more of

23 methamphetamine), and 963 (drug conspiracy), having a value of

24 greater than $10,000.

25    137. The Defendant Real Property is therefore subject to

1   forfeiture under 18 U.S.C. § 981(a)(1)(A) as having been the subject

2   of, and likewise involved in, unlawful monetary transactions

3   committed in violation of 18 U.S.C. § 1957.

4        WHEREFORE, the Plaintiff United States of America prays that:

5        (a)   Due process issue to enforce the forfeiture of the

6              Defendant Real Property;

7        (b)   Due notice be given to all interested parties to

8              appear and show cause why forfeiture should not be

9              decreed;

10       (c)   This Court decree forfeiture of the Defendant Real

11             Property to the United States of America for

12             disposition according to law; and

13       (d)   This Court order such other and further relief as the

14             Court may deem just and proper, together with the

15             costs and disbursements of this action.

16

17

18   Dated: February 6, 2025          /s/
                                      MARGARET A. MOESER
19                                    Chief, Money Laundering and
                                      Asset Recovery Section
20                                    Criminal Division
                                      U.S. Department of Justice

21                                    STEPHANIE WILLIAMSON
                                      Trial Attorney, Money Laundering
22                                    and Asset Recovery Section

23                                    CHELSEA R. ROONEY
                                      Trial Attorney, Money Laundering
                                      and Asset Recovery Section

24
                                      Attorneys for Plaintiff
25                                    UNITED STATES OF AMERICA

VERIFICATION

I, Kyle J. Mori, hereby declare that:

1.    I am a Supervisory Special Agent with the United States Drug Enforcement Administration.

2.    I have read the above Verified Complaint for Forfeiture and know its contents.

3.    The information contained in the Complaint is either known to me personally, was furnished to me by official government sources, or was obtained pursuant to subpoena or other legal process. I am informed and believe that the allegations set out in the Complaint are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 6th of February 2025 in WASHINGTON, D.C.     .

Kyle J. Mori
Supervisory Special Agent